J-A24029-16

2016 PA Super 242

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| EDWARD YALE | |
| Appellant | No. 3678 EDA 2015 |

Appeal from the Judgment of Sentence November 19, 2015
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001540-2013

BEFORE:  BOWES, J., OTT, J., and SOLANO, J.

OPINION BY OTT, J.:                                    **FILED NOVEMBER 10, 2016**

Edward Yale appeals from the judgment of sentence imposed on November 19, 2015, in the Court of Common Pleas of Monroe County, following his conviction by jury on the charges of third-degree murder and tampering with evidence.[1]  He received an aggregate sentence of 20 – 40 years' incarceration plus restitution and costs.  In this timely appeal, Yale raises six issues.  The first three issues address different aspects of testimony and jury instruction regarding the Commonwealth's rebuttal witness, Dr. Wayne Ross.  In issues four and five, Yale claims the trial court erred in allowing the Commonwealth to cross-examine defense witness, Robert Vandercar, beyond the scope of direct examination and in allowing

_____

[1] 18 Pa.C.S. §§ 2502(c) and 4910(1), respectively.

Commonwealth witness, Philip Barletto to testify as an expert in crime scene reconstruction when he had not been qualified in that field. Finally, Yale argues the trial court erred in failing to charge the jury on the crimes of voluntary and involuntary manslaughter. After a thorough review of the certified record, submissions by the parties and relevant law, we affirm.

The facts and history of this matter are quite complex and comprise greater than 16 pages of the trial court' Pa.R.A.P. 1925(a) opinion. We have confirmed those facts and history as being supported by the certified record. We distill that information provided by the trial court herein.

On March 22, 2001, Yale's wife, Joan Yale, was found at the foot of the staircase leading from the kitchen to the garage. Mrs. Yale had suffered massive injuries to her head and chest, resulting in her death. Initially, the medical examiner ruled Mrs. Yale had died from blunt force trauma, but made no determination regarding the manner of death. Yale, an ex-police chief of Upper Mount Bethel Township and former boxer, was not charged with a crime.

Many years later, for reasons unexplained in the record, the state police reexamined the evidence and asked Dr. Marianne Hamel, M.D., a board certified forensic pathologist, to review the medical evidence. She concluded that the trauma suffered by Mrs. Yale was not consistent with a fall down the steps. Rather, she believed Mrs. Yale had, essentially, been

"stomped" to death.[2]  Yale was subsequently charged with the murder of Joan Yale, his second wife.

Consistent with the prosecution of a more than decade old murder, both the prosecution and defense relied heavily on their respective medical experts.  All parties agreed the cause of death was blunt force trauma; it was the manner of death, accidental or homicide, that was at issue.  As noted above, Dr. Hamel testified for the Commonwealth giving her opinion that Mrs. Yale had been stomped to death.  The defense called Dr. John J. Shane, M.D., and Dr. Charles C. Catanese, M.D.  Dr. Shane opined Mrs. Yale died as a result of accident, specifically, from injuries suffered from falling down the 11 steps to the basement/garage.  Dr. Catanese also concluded the manner of death was accidental, but that Mrs. Yale most likely stumbled toward or at the foot of the staircase and her injuries were then caused by pitching forward into a pile of firewood.  On rebuttal, the Commonwealth also presented the testimony of Dr. Wayne Ross, M.D.  Dr. Ross opined Mrs. Yale had been murdered.  He testified she had been strangled and beaten. He could not specifically state how she had been beaten, but could not rule out having been stomped/kicked for at least some of the time.

_____

[2] Dr. Hamel described the injuries as "stomping injuries."  ***See*** N.T. Trial 10/15/2015 at 105.

Mrs. Yale was approximately 5'6" tall and weighed approximately 290 pounds. Although there were many objects on the staircase leading to the garage, including a coffee can full of golf balls, an uncovered can of nails, a pair of boots, and fire extinguisher box, they were largely undisturbed. A single nail was found outside of the can. No trace elements such as blood or fibers from Mrs. Yale's red boiled-wool coat were found on the stairs. Although Yale was in the home during the entire time in question, he testified he did not hear his wife fall down the steps. Rather, he claimed that approximately 20 minutes after she said she was leaving the house to go to a hair appointment, he realized he had not heard the garage door open. When he went to investigate, he found his wife at the foot of the stairs. He further testified he tried to give aid, he rolled her onto her back, but realized she had died. He then telephoned for help.

Yale's first three claims all involve the testimony of the Commonwealth's rebuttal witness, Dr. Wayne Ross. Dr. Ross testified as to the cause and manner of Mrs. Yale's death. With regard to his first two issues, Yale argues this evidence should have been introduced in the Commonwealth's case in chief. As such, Yale claims the trial court erred in allowing Dr. Ross to give opinion testimony on the cause and manner of death and then compounded the error by denying his request for mistrial. In support of this claim, Yale cites **Daddona v. Thind**, 891 A.2d 786 (Pa. Cmwlth. 2006) which states in relevant part:

"Rebuttal evidence" is defined in Black's Law Dictionary (5th ed.1979) as '[e]vidence given to explain, repel, counteract, or disprove facts [as opposed to opinions] given in evidence by the adverse party.' " **Feingold v. Se. Pa. Transp. Authority**, 339 Pa. Super. 15, 488 A.2d 284, 290 (1985), aff'd, 512 Pa. 567, 517 A.2d 1270 (1986). "A party cannot, as a matter of right, offer in rebuttal evidence which is properly part of his case in chief, but will be confined to matters requiring explanation and to answering new matter introduced by his opponent." **Clark** [**v. Hoerner**], 525 A.2d [377] at 382-83. Indeed, as explained by our Supreme Court:

It is an elementary proposition that the plaintiff must prove during his case in chief all essential elements of his action as to which he has the burden of proof, and that he may not as a matter of right introduce evidence in rebuttal which is properly part of his case in chief. *The trial court has discretion in excluding as rebuttal evidence that which is properly part of the case in chief.*

**Downey v. Weston**, 451 Pa. 259, 268-69, 301 A.2d 635, 641 [(1973)](emphasis added) (citations omitted). A trial court may properly exclude evidence offered on rebuttal if it is cumulative of evidence already presented. **Estate of Hannis v. Ashland State Gen. Hosp.**, 123 Pa.Cmwlth. 390, 554 A.2d 574 (1989). Repetitive testimony is improper rebuttal. **Kline v. Behrendt**, 396 Pa.Super. 302, 578 A.2d 526 (1990).

**Daddona**, 891 A.2d at 813-14. [3]

These cases provide no support for Yale's argument. The Commonwealth did produce testimony regarding the cause and manner of death of Mrs. Yale in its case in chief. Dr. Hamel provided lengthy testimony regarding her expert medical opinion that Mrs. Yale had been murdered and

---

[3] Additionally, Yale independently cited the quote from **Clark v. Hoerner**, 525 A.2d 377 (Pa. Super. 1987), found in **Daddona**, thereby emphasizing that point.

that the genesis of her injuries was not an accidental fall down the steps, but was from being stomped to death.[4]

In his defense, Yale provided two experts who contradicted Dr. Hamel's conclusions regarding the manner of death and genesis of the blunt force trauma. The doctors provided detailed testimony regarding how they believed Mrs. Yale had suffered her fatal injuries. Although Drs. Catanese and Shane held differing opinions on where Mrs. Yale had fallen, they both agreed that the catastrophic injuries she suffered were the result of an accident and not inflicted by another human. In rebuttal, Dr. Ross provided his medical opinion on why Drs. Catanese and Shane were incorrect, which opinion necessarily included addressing the very issues of manner of death and genesis of the blunt force trauma. Dr. Ross primarily opined why the injuries were unlikely to have been caused by the accidental means described by the defense experts and, secondarily, the most likely method by which the injuries occurred. This testimony allowed the jury to fully consider and compare the opinions of the defense experts and the bases of those opinions. Accordingly, there was nothing improper about the subject of Dr. Ross's testimony, nor the scope of that testimony. In light of this, we find the trial court did not abuse its discretion in allowing Dr. Ross to testify as to the cause and manner of death.

---

[4] Since there was no error in allowing Dr. Ross's substantive testimony, there was no error in the trial court's denial of Yale's request for mistrial.

Yale's third argument regarding Dr. Ross is a claim the trial court erred in failing to give a limiting instruction to jury regarding the doctor's rebuttal testimony. Specifically, he wanted the trial court to instruct the jury as follows:

> You have heard the testimony of Dr. Wayne Ross, offered by the Commonwealth in rebuttal. This testimony can only be offered to explain, repel, contradict or disprove facts or opinions submitted by the defense experts. You cannot consider his testimony as evidence of Mr. Yale's guilt or innocence; rather, the Commonwealth must prove his guilt in its case in chief, that is the evidence presented before the Defendant's case. It would be improper for you to consider this rebuttal evidence as proof of the essential elements of the charges against Mr. Yale. *See Dadonna* [sic] *v. Thind*, 891 A.2d 786, 813 (2006).

Appellant's Brief at 18.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Janda*, 14 A.3d 147, 163 (Pa. Super. 2011) (citation omitted).

Initially, we note there is no suggested standard jury instruction regarding the admission or use of rebuttal testimony. Our review of *Daddona*, as well as prior relevant case law,[5] also leads us to conclude

---

[5] *See also*, *Downey v. Weston*, 301 A.2d 635 (Pa. 1973), *Potochnik v. Pittsburgh Rys. Co.*, 108 A.2d 733 (Pa. 1954); *Clark v. Hoerner*, 525 A.2d 277 (Pa. Super. 1987).

there is no absolute rule regarding the use and application of rebuttal testimony.

Additionally, our Supreme Court has stated:

However, it is equally true that it is within the discretion of the trial court to permit evidence, in rebuttal, which should have been given in chief, provided only that the action of the trial court in this regard is not arbitrary or capricious.

***Potochnik v. Pittsburgh Rys. Co.,*** 108 A.2d 733, 739 (Pa. 1954) (citation omitted).

In its Pa.R.A.P. 1925(a) opinion, the trial court explained:

The defense objection seems to center on the fact that Dr. Ross not only suggested why the defense experts were wrong, but that he had his own theory of how Joan Yale received her extensive injuries. However, for the jury to understand why Dr. Ross felt the defense explanations were wrong, they needed to know his analysis of what did happen. It would not have been proper to restrict him from giving his own opinion of the causation of the injuries. His opinion was similar to that of Dr. Hamel, but he did not narrow the cause down to strangulation and stomping as she did. He opined that Joan Yale was strangled, her head was struck by a log and/or her head was taken and slammed down and scraped.[6] This testimony directly contradicted the defense experts.

Trial Court Opinion at 22-23.[7]

_____

[6] Dr. Ross also opined that several of Mrs. Yale's injuries were consistent with being stomped or kicked, as Dr. Hamel opined. **See** N.T. Trial, 10/21/2015, at 89, 96, 119-122.

[7] Although this quote is taken from the section of the trial court opinion addressing the jury charge, we note it is equally applicable to Yale's first two issues regarding Dr. Ross as well.

The trial court's admission of that portion of the rebuttal evidence addressing the manner of death, even if it should have been admitted in the case in chief, was neither arbitrary nor capricious. *Potochnik*, *supra* (trial court action in allowing rebuttal testimony may not be arbitrary or capricious). Therefore, the trial court's charge regarding expert witnesses was proper and the trial court did not err in refusing to give Yale's proposed charge limiting the use of rebuttal evidence. Accordingly, Yale is not entitled to relief on this issue.

Next, Yale claims the trial court improperly allowed the Commonwealth to cross-examine defense witness, Robert Vandercar, beyond the scope of his direct examination. As provided by the Pennsylvania Rules of Evidence,[8] in general, the scope of cross-examination is limited to the subject matter of the direct examination and matters of credibility. However, the rule

_____

[8] Specifically, Pa.R.E. 611(b) states:

> **(b) Scope of Cross-Examination.** Cross-examination of a witness other than a party in a civil case should be limited to the subject matter of the direct examination and matters affecting credibility, however, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination. A party witness in a civil case may be cross-examined by an adverse party on any matter relevant to any issue in the case, including credibility, unless the court, in the interests of justice, limits the cross-examination with respect to matters not testified to on direct examination.

Pa.R.E. 611(b)

specifically notes the trial court retains the discretion to admit other inquiry as it deems proper.

Vandercar testified on behalf of Yale that he had known Joan Yale for approximately 45 years, Yale for four years, and had been their neighbor for four years. He testified he had not heard the Yales arguing. In its Pa.R.A.P. 1925(a) opinion, the trial court characterized this testimony as leading "the jury to believe that a person who was very familiar with Joan and Ed Yale and their marriage was unaware of any marital strife." Trial Court Opinion, 2/16/2016 at 27. Cross-examination by the Commonwealth attempted to establish just how well he knew the family and the opportunities he had actually had to overhear the Yales. The most significant aspect of the cross-examination was eliciting the testimony that prior to her death, Joan Yale had told Vandercar she was afraid her husband would kill her. Vandercar had revealed this statement to Yale when Yale first approached him to discuss the fact the police had reopened the investigation. Although a prior panel of our Court had ruled the statement was inadmissible to show the victim's state of mind,[9] the trial court allowed the statement into evidence to show its effect on Yale.[10] Additionally, the trial court gave a prompt limiting

_____

[9] *See Commonwealth v. Yale*, 116 A.3d 697 (Pa. Super. 2014) (unpublished memorandum).

[10] Vandercar testified that after he told Yale what his wife said, Yale "[S]macked himself in the forehead, and he said to me twice, This is a setup. This is a setup." N.T. Trial, 10/19/2015 at 80.

instruction to the jury, explaining they could not consider the evidence for the truth of the statement, but only for its effect on Yale during the course of his conversation with Vandercar.

More importantly, the trial court found that through Vandercar's direct testimony, the defense sought to infer that a close friend of the Yales, especially of Joan Yale, was unaware of any marital discord. We find that Vandercar's statement that Joan confided she was afraid of her husband provided a stark contradiction of that inference. Accordingly, the statement was both relevant and admissible. *See Commonwealth v. Spenny*, 128 A.3d 234, 251 (Pa. Super. 2015) (the law is clear that we may affirm the trial court's decision on any proper basis).

Reading Vandercar's testimony *in toto*, we find the cross-examination of Vandercar was reasonably related to the subject matter and inferences raised by the defense during the direct examination. Specifically, Joan Yale's statement to Vandercar was not offered to demonstrate her state of mind, but to contradict the inference that Vandercar was unaware of any trouble between the Yales, and to demonstrate Yale's reaction to the statement. As such, the trial court committed no error in allowing said cross-examination to proceed.

At trial, the Commonwealth offered Philip P. Barletto as an expert in both blood spatter analysis and crime scene reconstruction.[11] Yale's penultimate issue is a claim the trial court erred in accepting Barletto as an expert in the field of crime scene reconstruction. At trial, Yale accepted Barletto as an expert in blood spatter analysis, but challenged his qualification as a crime scene reconstructionist. However, in his 1925(b) statement, Yale claimed the trial court erred in accepting Barletto as an expert in the field of blood "pattern" analysis, not crime scene reconstruction. As such, the issue is arguably waived.

---

[11] The standard for expert qualification is well settled.

> The qualification of a witness as an expert rests within the sound discretion of the trial court, and the court's determination in this regard will not be disturbed absent an abuse of discretion. **See Commonwealth v. Serge**, 837 A.2d 1255, 1260 (Pa. Super. 2003). As stated by this Court:
>
>> The standard for qualification of an expert witness is a liberal one. The test to be applied when qualifying an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. **Commonwealth v. Wallace**, 817 A.2d 485 (Pa. Super. 2002).... A witness does not need formal education on the subject matter of the testimony, and may be qualified to render an expert opinion based on **training and experience.** *Id*.
>
> **Commonwealth v. Malseed**, 847 A.2d 112, 114 (Pa. Super. 2004) (emphasis in original) (*quoting* **Serge**, **supra.**).

**Commonwealth v. Toritto**, 67 A.3d 29, 37 (Pa. Super. 2013).

Nonetheless, the trial court determined Barletto was qualified to testify as a blood spatter expert. The trial court found Barletto had been qualified as an expert in Pennsylvania courts in the fields of crimes scene processing, fingerprint analysis, blood spatter analysis, and crime scene reconstruction. Barletto spent 14 years in the forensic services unit of the Pennsylvania State Police. He investigated more than 300 deaths and took a variety of specialized classes, including crime scene reconstruction. The trial court stated, "[Barletto] had a reasonable pretension to specialized knowledge on this subject [blood spatter] due to his extensive experience and training." Opinion, at 31. The certified record reflects this reasoning is equally applicable to Barletto's qualifications as a crime scene reconstructionist. Even if the issue had not been waived, the trial court committed no error in accepting Barletto as an expert in either field.

Yale's final issue is a claim the trial court erred in failing to charge the jury on the crimes of voluntary and involuntary manslaughter. On this issue, we rely on the able analysis of the Honorable Arthur L. Zulick, who opined:

> [Yale] requested a charge on voluntary and involuntary manslaughter. Mr. Yale was charged with a single count of criminal homicide in Count I of the information. The parties agreed that the jury would be charged on first degree murder and third degree murder. The Commonwealth objected to the charge on voluntary manslaughter and involuntary manslaughter because there was no evidence in the case suggesting that Joan Yale's killing was done in the heat of passion or in a grossly negligent fashion. The defense request for the charge was denied.

The Pennsylvania Supreme Court recently stated:

[d]efendants are generally entitled to instruction that they have requested and that are supported by the evidence. We have explained that the reason for this rule is that "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." A criminal defendant must, therefore, "establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial."

*Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657, 668 (Pa. 2014).

The issuance of lesser-included homicide offenses must be "firmly grounded in logic and policy," and cannot be justified "as giving a jury discretion to dispense mercy." *Commonwealth v. Williams*, 415 A.2d 403, 404-05 (Pa. 1994). The *Williams* court cautioned:

To instruct a jury on possible verdicts that are unsupported by any evidence can serve only to pervert justice: Not only may the jury be confused by what appear to be irrelevant instructions, and thereby possibly reach a mistaken verdict, but a conviction for the lesser offense may occur out of discriminatory favor for the defendant or out of animosity for the victim, or the jury might substitute its own visceral reaction for the classification established by the legislature.

*Id*.

The elements of a voluntary manslaughter charge are as follows:

A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed.

- 14 -

18 Pa.C.S.A. § 2503.

The elements of an involuntary manslaughter charge are as follows:

Involuntary manslaughter is defined as a killing that occurs when, "as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, [an individual] causes the death of another person."

18 Pa.C.S. § 2504(a).

Here there was no evidence of any sudden or intense passion which incited Edward Yale to kill his wife. No one was present in the basement that day before the EMT arrived, other than Edward Yale and Joan Yale. The entire defense case was that Edward Yale was watching television, not killing his wife in the basement. There was not a scintilla of evidence of a serious provocation made by Joan Yale to incite her murder. Likewise, there was no evidence that she killed in a reckless or grossly negligent fashion. The evidence that she was murdered consisted of her injuries and the condition of the scene.

Trial Court Opinion at 24-25.

Accordingly, the trial court did not err in denying Yale's requested jury charges for voluntary and involuntary manslaughter.

In light of the foregoing, Edward Yale is not entitled to relief.

Judgment of sentence affirmed.

J-A24029-16

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/10/2016